FILED
8/22/17 4:43 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA

IN THE UNITED STATES BANKRUPTCY COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

IN RE:

| | | |
|---|---|---|
| DOUGLAS A. GROOMS, | : | Case No. 16-10030-TPA |
| *Debtor* | : | |
| | : | Chapter 7 |
| | | |
| JOSEPH B. SPERO, TRUSTEE, | : | Adv. No. 16-1041-TPA |
| *Plaintiff* | : | |
| | : | |
| v. | : | Related to Doc. No. 1, 29, 46 |
| | : | |
| COMMUNITY CHEVROLET, INC., and | : | |
| THE UNITED STATES OF AMERICA, | : | |
| *Defendant*s | : | |

*Appearances:* John C. Melaragno, Esq.  for the Trustee/Plaintiff
John Nagurney, Esq. for Defendant Community Chevrolet, Inc.
Jill Locnikar, Esq. for Defendant United States of America

**MEMORANDUM OPINION**

This is a preference action filed by the Chapter 7 Trustee, Joseph B. Spero ("Trustee"), seeking to recover a $100,000 "criminal restitution" payment made pre-petition by the Debtor, Douglas Grooms ("Grooms"), to an automobile dealership operating under the name of Community Chevrolet ("CC").  The United States of America ("U.S.") was not originally a party to the action but upon motion was permitted to intervene as a defendant based on its interest in the subject matter of the action since the "restitution" payment at issue was made in the context of a federal criminal charge against Grooms.

1

Following the completion of discovery, both the Trustee and the U.S., respectively, filed **Motions for Summary Judgment** (individually, "Trustee Motion" and "U.S. Motion," and collectively "Motions"). *See*, Doc. Nos. 29, 46. The *Motions* have been briefed by all Parties and argument on them was heard in March, 2017. Following the argument, the Court expressed doubt as to whether it could grant either of the *Motions* based on the record presented, suggesting that it would be helpful to have before it some additional evidence related to the circumstances by which the restitution payment came to be made. The Parties disagreed, indicating that even if the case were to proceed to trial they would not anticipate presenting any further evidence beyond what was already before the Court. All Parties urged that the case be decided on summary judgment.

The Court, acknowledging that it would be a waste of time to schedule a trial if no further evidence would be presented, agreed to make every effort to decide the case on summary judgment. In order to assure that the Parties had a full opportunity to consider the situation, the Court issued an Order on March 14, 2017, at Doc. No. 73, advising them that if they wished to present any further evidence they should timely notify the Court of their intent or it would proceed to decide the *Motions* based solely on the existing record. The U.S. and CC both affirmatively filed responses stating that neither planned to present any further evidence. The Trustee did not file any response, which, according to the March 14th Order, was tantamount to indicating an intent to proceed solely on the current record. Thus, the *Motions* are now ripe for decision.[1] For the reasons which follow, the Court will grant the *Trustee Motion* and deny the *U.S. Motion*.

---

[1]      The Court has jurisdiction to hear and decide this matter pursuant to *28 U.S.C. §§1334* and *157(a)*. This is a core matter pursuant to *28 U.S.C. §157(b)(2)(F)*.

2

### *FACTS*

Grooms was employed as the general manager at CC in Meadville, PA, from 2008 through 2013.  During that time he engaged in a scheme to embezzle money from CC by creating phony invoices from  an entity he called "Bullseye Marketing," purportedly created for providing non-existent marketing services to the dealership and then having its invoices paid by CC.  Grooms operated with the help of a co-conspirator in another state who received the payments, took a cut for his services, and then forwarded the remainder to Grooms.  Over the course of the scheme Grooms stole approximately $485,000 from CC in this manner.   The owner of CC, Robert Kongelka ("Kongelka"),  was not actively involved in the day-to-day running of the business, relying on Grooms to do so.  This likely explains why Grooms was able to get away with his scheme  for so long a time.

Grooms was fired from CC in early 2014 for some unrelated misconduct.  Following his departure, CC personnel and the company's attorney reviewed  the Bullseye Marketing account and it came under suspicion.  CC contacted the Postal Inspection Service with its suspicions, and the matter was eventually referred to the U.S. Attorney's office for the Western District of Pennsylvania for further investigation and possible prosecution.  On June 16, 2015, Kongelka was informed by the U.S. Attorney that Grooms had admitted to embezzling funds from CC  and that he intended to make full restitution.

The details following Grooms' admission of wrongdoing are not as clear as they could be.  Apparently Grooms and his criminal attorney, William Weichler ("Weichler"),  engaged in discussions with WDPA Asst. U.S. Attorney Christian Trabold ("Trabold") about a possible  plea

3

agreement even before any criminal charges were filed.  Kongelka was not involved in these

discussions.  At some point Kongelka was informed by the U.S. Attorney that an  agreement had

been reached for Grooms to make "full restitution" to CC prior to any guilty plea.  However, after

the plea agreement was struck, apparently Grooms could not come up with the full amount of

restitution in advance and convinced the U.S. Attorney to change the agreement to allow Grooms

to make at least a $100,000 "payment in restitution" to CC prior to pleading guilty, with the balance

to be subsequently paid.

That plea agreement offer was memorialized in writing in a letter dated November

12, 2015, from the U.S. Attorney to Weichler and included lines for signatures by Grooms and

Weichler.  This letter appears to be only  a first or discussion draft of an agreement because: (1)

there are indications that it was based on an incomplete form letter (e.g., "Enter He/She" and "Enter

Opposing Counsel's Name" appear in several places); (2)  the letter refers to the criminal case only

as "United States of America v. Douglas A. Grooms, Criminal No. 15-_____ Erie" apparently

because no criminal charges had actually yet been filed against Grooms; and, (3) the letter is

unsigned by anyone from either side.  Trabold also e-mailed a copy of the November 12th letter to

CC's attorney, John Nagurney ("Nagurney").

Grooms obtained the money that was used to make the initial $100,000 restitution

payment from two loans totaling $50,000 that he got  from Erie Bank[2] in late October 2015 and a

---

[2]      In another adversary proceeding, Grooms agreed, and thereafter this Court directed,
that pursuant to *11 U.S.C. §727(a)(10)* he is not entitled to a discharge in this case.  *See, UST v.
Grooms*, Adv. No. 16-1034. Separately, he also entered into a stipulation with Erie Bank, approved
by the Court,  that his debt to the bank on the two loans is non-dischargeable pursuant to *11 U.S.C.
§523*. *See*, Doc. No. 45.

bonus advance of $80,000 (before tax withholding) that he was able to obtain from Rick Weaver

Buick where he was working at the time.  As a result, a $100,000 payment was sent to Kongelka on

November 18, 2015 by Weichler and was deposited into a CC bank account.  Though the particulars

are unclear from the record, it would appear that Grooms had previously either directly or indirectly

deposited funds into Weichler's firm, which had been placed in the attorney's IOLTA account.  This

appears to be evident because the payment was by check dated November 18, 2015, payable to CC,

and thereafter drawn on the firm's IOLTA account.  The cover letter from Weichler notes that this

was the "commencement" of restitution, and that Grooms intended to make further payments until

restitution was made in full.  Trabold was copied on the letter "to advise him that this payment was

made."

A new version of the plea agreement letter was prepared on December 7, 2015.  It

is in all substantial respects identical to the November 12th letter,  except that it has been cleaned up

to remove the "form letter" indications  and it  appears to have been signed by the U.S. Attorney on

the date of the letter.  The criminal case number was still left blank in the typeface version of the

letter, but is handwritten in.  That must have been done sometime later because the criminal charge

against Grooms  was not actually filed until  December 15, 2015, by the issuance of an Information

charging him with one count of conspiracy to commit wire fraud in violation of *18 U.S.C. §1349.*

Weichler and Grooms must have seen the Information before it was filed because the plea agreement

letter refers to a draft copy of an Information involving that same offense.[3]

---

[3]    This is an example of the sort of detail that the Court had hoped would be fleshed out
more by the presentation of testimony at a trial.  In the absence of any direct evidence as to such
details the Court has done its best to "connect the dots."

Grooms filed his bankruptcy petition on January 15, 2016.  The Trustee was appointed on January 20, 2016, and the §341 Meeting of Creditors was conducted on February 17, 2016.  A few days after the 341 Meeting, the Trustee made a demand on CC for a return of the $100,000 payment on the basis that it constituted an avoidable preference.  A meeting occurred between Kongelka, Nagurney and the Trustee to discuss the matter but no resolution was reached.

On February 29, 2016, the Hon. David S. Cercone, District Court Judge for the Western District of PA, held a "waiver of indictment and guilty plea" hearing in the Grooms criminal case.   The Parties reported to him  that there was a plea agreement with a stipulated sentence and he explained to Grooms that he (the judge) was not bound to agree with the stipulated sentence, but that if he did not do so, Grooms could withdraw his guilty plea.  The plea agreement was entered into the record as an exhibit and the basic terms of the plea agreement were described by Trabold, including the restitution component.  The fact that Grooms had already made a $100,000 payment to CC was also disclosed.  Grooms confirmed that he had reached the plea agreement freely and voluntarily.   He then pleaded guilty to the charge in the Information.  Judge Cercone "preliminarily" accepted the plea  and set a sentencing date of July 11, 2016 so that a pre-sentence investigation could be done.  The December 7, 2015, plea agreement letter discussed above indicates that it was signed by Grooms on February 29, 2016, and there is a statement in the transcript by Judge Cercone to Grooms signing a document in his presence at the hearing "reflecting his plea of guilty," which may have been a reference to this letter.

The Grooms sentencing hearing was held on July 11, 2016, as had been scheduled. Judge Cercone began by saying that he was accepting Grooms' guilty plea, an apparent reference

6

to the fact that he had only preliminarily accepted it at the February 29th hearing.  He also sentenced

Grooms to 24 months incarceration, two years supervised release, full restitution in the amount of

$485,800, less any amount already paid, and a $100 special assessment.  This was noted to be in

accordance with the sentence as proposed in the plea agreement.[4]   Kongelka, who had also

submitted a "Victim's Statement" to the District Court prior to the hearing, appeared and was

allowed to speak.  He informed Judge Cercone about the $100,000 payment, and then went on to

say:

> Unfortunately, Mr. Grooms' Chapter 7 trustee has demanded that the
> restitution payment be disgorged because it was filed [sic] within 90
> days of the Grooms bankruptcy filing.  I anticipate this issue will be
> litigated.  My attorney informs me that there is no certainty that I will
> retain the $100,000 paid to me as partial restitution.  I do not
> understand how Mr. Grooms can receive the benefit of his plea
> bargain while another branch of the justice - department demands that
> I refund the partial restitution I received.

*Trustee Ex. A* at 7, Doc. No. 58 (Transcript of July 11, 2016 sentencing hearing in U.S. v. Grooms,

Criminal No. 15-44 Erie).  Kongelka asked that either Grooms' plea agreement should be rejected,

or alternatively that sentencing be rescheduled until after he had received some certainty that he

would be able to keep the $100,000.

Judge Cercone asked Trabold if he had any response to those comments and Trabold

said he could not control what the bankruptcy trustee was doing, but that he was trying to "work

things out" with the Trustee so that the money would not have to be paid back, which Trabold

---

[4]      Actually, the plea agreement referred to three (3) years of supervised release
following incarceration, so the sentence imposed by Judge Cercone was a bit more lenient in that
respect.

thought would be an "unjust resolution."  He also said, however, that he could not guarantee what

happened.  Judge Cercone then stated:

> I never heard of that.  I never heard of restitution paid pursuant to a
> district court judge's sentencing order be, what's the word I want to
> say – be overturned, if you will, by the bankruptcy.

*Id*. at 8.  Trabold then commented that he would have looked more skeptically at the restitution

payment had he known Grooms would be filing for bankruptcy only a few weeks later.  Judge

Cercone then stated:

> Again, I haven't really spent the time researching the issue, but this
> $100,000, this wasn't paid pursuant to some business obligation or
> contractual obligation or even a civil judgment.  This was part of a
> sentence in a criminal court.  I can't imagine that the amount would
> be disturbed, that order of court would be disturbed by a bankruptcy
> court.

*Id*. at 10.  Weichler then spoke up and said he thought the Bankruptcy Code "has a specific

exemption precisely as your Honor makes reference to."  Judge Cercone then stated, with reference

to the restitution issue:

> This other matter, while related, is a separate case.  And there is, as
> was brought to the court's attention, I assume that was the case,
> there's a specific exemption in the law for restitution orders in
> criminal cases.  I'm confident that the system will work and achieve
> a fair result.  Courts have to operate efficiently, too.  I can't just hold
> up this sentencing until a civil matter is resolved.  Who knows how
> long that case can take down the road.  Civil matters and criminal
> matters are different and separate and have to be treated by the court
> as such.  So having said that, I'm prepared to proceed to sentencing
> today....

*Id*. at 11.  He then proceeded to sentence Grooms as was indicated above.  A criminal judgment order, including the restitution component,  was entered on July 18, 2016.

The Trustee filed the complaint initiating this  adversary proceeding on August 16, 2016.  Discovery has been completed to the satisfaction of all Parties.

### *SUMMARY JUDGMENT STANDARD*

Summary judgment shall be granted if, drawing all inferences in favor of the non-moving party, "the movant shows that there is no genuine issue as to any material  fact and the movant is entitled to judgment as a matter of law." *Fed.R.Bankr.P. 7056*, incorporating *Fed.R.Civ.P. 56(a)*.  A fact is "material" if proof of its existence or non-existence might affect the outcome of the suit under applicable law.  *Anderson v. Liberty Lobby Inc*., 477 U.S. 242, 248 (1986); *School District of Pittsburgh v. C.M.C.*, 2016 WL 4273175 *4 (W.D. Pa. August 12, 2016).

The  moving party  therefore has the  burden to prove the absence of genuine issues of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).  If the movant  shows the absence of genuine issues of material fact, the nonmoving party must "set forth specific facts showing there is a genuine issue for trial." *Id.*  at 322, n. 3.  In reviewing a motion for summary judgment, the Court does not make credibility determinations and it must view the facts in the light most favorable to the non-moving party  and draw all inferences in that party's favor. *Siegel Transfer, Inc. v. Carrier Express, Inc*., 54 F.3d 1125, 1127 (3d Cir.1995);  *Abramson v. William Paterson College of New Jersey*, 260 F.3d 265, 276 (3d Cir.2001).

When the parties have filed cross-motions for summary judgment, as here, the summary judgment standard remains the same. *Palumbo v. United States*, 788 F. Supp. 2d 384, 386-87 (W.D. Pa. 2011). The Court must rule on each party's motion on an individual and separate basis, determining, for each side, whether a judgment may be entered in accordance with the summary judgment standard. *Id.* If review of the cross-motions reveals no genuine issue of material fact, then judgment may be entered in favor of the party deserving of judgment in light of the law and undisputed facts. *Iberia Foods Corp. v. Romeo*, 150 F.3d 298, 302 (3d Cir. 1998.)

## *DISCUSSION*

### *(1)    U.S.  Inability to Prevent Preference Recovery*

Resolution of the *Motions* requires a decision as to which of two statutory imperatives must be followed under the particular facts of this case:  the preference avoidance provision of the *Bankruptcy Code*, as argued by the Trustee, or the criminal restitution provisions embodied in the *Mandatory Victims Restitution Act* ("MVRA"), as argued by the U.S.  A secondary issue which must be faced if the Court determines that preference avoidance takes precedence, is whether the Trustee should nevertheless be denied relief because the $100,000 transfer falls within the "new value" exception to the prohibition against preferential transfers.

The Trustee takes the position that this case is governed by *11 U.S.C. §547(b)*, which provides:

> (b)    Except as provided in subsections (c) and (i) of this section, the trustee may avoid any transfer of an interest of the debtor in property--

(1)     to or for the benefit of a creditor;

(2)     for or on account of an antecedent debt owed by the debtor before such transfer was made;

(3)     made while the debtor was insolvent;

(4)     made–
  (A)     on or within 90 days before the date of the filing of the petition; or
  (B)     between ninety days and one year before the date of the filing of the petition, if such creditor at the time of such transfer was an insider; and

(5)     that enables such creditor to receive more than such creditor would receive if–
  (A)     the case were a case under chapter 7 of this title;
  (B)     the transfer had not been made; and
  (C)     such creditor received payment of such debt to the extent provided by the provisions of this title.

*11 U.S.C. § 547(b).*

According to the Trustee, all of the elements of this provision are met. CC was a creditor of Grooms and the $100,000 payment was on account of an antecedent debt he owed to CC. Grooms was insolvent when he made the payment and the payment was made within 90 days of Grooms' bankruptcy filing. Finally, the payment enabled CC to receive more than it would have in a normal Chapter 7 distribution if the payment had not been made. With the exception that CC objects that the payment was not on account of an antecedent debt based on its new value defense, the Defendants both concede, or at least do not dispute, that all the required elements for a preferential transfer under *Section 547(b)* have been met. *See, generally*, the *Trustee Motion* and the corresponding responses by the U.S. and CC at ¶¶ 17, 20, 27, 31, 34, Doc. Nos. 29, 43, 50. The

Court therefore finds that the Trustee has proven his case for a preferential transfer, subject only to the possible application of a new value defense, as will be discussed further below.

The *U.S. Motion* is based on the premise that another provision of federal law dealing with criminal restitution that is part of the *MVRA* has primacy over the preference avoidance provision in the *Bankruptcy Code* such that CC should be permitted to retain the payment even though it would otherwise be an avoidable preference. Because the *MVRA* is not a topic that comes up frequently in a bankruptcy context, some brief background information on it may be helpful.[5]

An effort called the "victims' rights movement" began in the 1970s and advocated for the view that the rights of crime victims were not being sufficiently recognized and protected in the criminal justice system. On the federal level, this movement resulted in the creation of a "Presidential Task Force on Victims of Crime," and eventually, the passage in 1982 of a statute known as the *Victim and Witness Protection Act* ("VWPA"). Prior to the passage of the *VWPA*, federal judges could only order restitution as a condition of probation, and such orders were not frequently imposed and not aggressively enforced. The *VWPA* authorized and encouraged judges to impose restitution obligations independent of probation. It also, however, included restrictions on judges in that regard by requiring them to consider the financial resources, financial needs, and earning ability of the defendant when deciding whether to require restitution.

---

[5]     This background information is being taken from a law review article on the subject. *See, Comment: Should Crime Pay?: A Critical Assessment of the Mandatory Victims Restitution Act of 1996*, 97 Calif. L. Rev. 1687 (2009).

12

The *VWPA* remained the applicable law in this area until 1996 when the *MVRA* was passed due to a perception that under the *VWPA* federal judges were not imposing restitution orders in enough criminal cases.  Among other things, the *MVRA* added a new *Section 3663A* to Title 18, entitled "Mandatory restitution to victims of certain crimes," amended *Section 3664*, entitled "Procedure for issuance and enforcement of order of restitution," and amended *Section 3613*, entitled "Civil remedies for satisfaction of an unpaid fine."

As indicated by its name, the *MVRA* made restitution mandatory in almost all cases in which the victim suffered an identifiable monetary loss, thus removing judicial discretion from the imposition of restitution.  The *MVRA* also mandated that courts order restitution to each victim in the full amount of the victim's loss as determined by the court, and without consideration of the economic circumstances of the defendant.  The *MVRA* did, however, require courts to consider the defendant's financial means when scheduling the time period for payment of restitution.

In support of its contention that the *MVRA* takes precedence over the *Bankruptcy Code* preference provision, the U.S. relies primarily on *18 U.S.C. §3613(a)*, which, with certain exceptions not relevant here, states in part:

> **(a) Enforcement**.--The United States may enforce a judgment imposing a fine in accordance with the practices and procedures for the enforcement of a civil judgment under Federal law or State law. *Notwithstanding any other Federal law* ... a judgment imposing a fine may be enforced against all property or rights to property of the person fined ....

13

*18 U.S.C. §3613(a)* (emphasis added).[6]   The U.S. argues that the "Notwithstanding any other Federal law" phrase in this statute makes clear that the *MVRA* was intended to sweep aside any other law that might interfere with the payment of restitution to crime victims.

The U.S. relies mainly on *In re Robinson*, 764 F.3d 554 (6th Cir. 2014) in support of its position.  The debtor in that case had pleaded guilty to federal charges in connection with two fraud schemes and he was ordered to pay criminal restitution.  The orders required the debtor to pay the restitution "in full immediately," but he had actually paid only a small fraction of what he owed when he filed for bankruptcy a number of years later.  The U.S. brought an adversary proceeding in the case asking for a declaratory judgment that the automatic stay did not apply to prevent it from enforcing the restitution orders against estate assets. The U.S. relied on  *18 U.S.C.  §3613(a)* in support of its position.[7]

---

[6]     Although *Section 3613(a)* uses the word "fine," the parties all agree that it includes a restitution obligation.  Additionally, there are several  other subsections in *Section 3613* that are relevant here and should be mentioned.    *Section 3613(c)* provides that an order of restitution is a lien in favor of the U.S. "on all property and rights to property of the person fined as if the liability of the person fined were a liability for a tax assessed under the Internal Revenue Code of 1986.  The lien arises on the entry of judgment and continues for 20 years or until the liability is satisfied, remitted, set aside or is terminated ...." *Section 3613(e)* provides that a restitution order is not discharged by a bankruptcy and a filed lien is not voided thereby.  Finally, *Section 3613(f)* states that "[i]n accordance with *Section 3664(m)(1)(A)* of this title, all provisions of this section are available to the United States for the enforcement of an order of restitution."

[7]     The U.S. had also relied in the alternative on *11 U.S.C. §362(b)(1)* (automatic stay exception for commencement or continuation of a criminal action against the debtor), but the *Robinson* court rejected that argument, drawing a distinction between an action against the debtor and an action against property.

14

The *Robinson* court agreed with the U.S., holding that on a plain reading basis the "notwithstanding" clause language used in the statute meant that it was intended to supersede conflicting laws.  764 F.3d at 559-60 (citing cases in support).  It found that the *Bankruptcy Code*, like any other statute, must yield if it conflicts with *Section 3613(a)*.  The *Robinson* court also found support for this result in the legislative history of the *MVRA*, and it noted that the mention of bankruptcy in *Section 3613(e)* suggested that Congress had the potential effects of the *Bankruptcy Code* in mind when it drafted *Section 3613(a)*.  Finally, since the *Bankruptcy Code* was absent from the list of exceptions set forth in *Section 3613(a)*, the court applied  the rule of statutory interpretation that where a statute specifies certain exceptions to its general application, other exceptions not specifically mentioned are excluded.  For all those reasons, the *Robinson* court found that *Section 3613(a)* authorized the government to proceed agaisnt property of the bankruptcy estate to enforce the restitution order despite the automatic stay.

A similar result was reached in *In re Partida*, 531 B.R. 811 (9th Cir. BAP 2015), *affirmed* 862 F.3d 909 (9th Cir. July 27, 2017) another case cited by the U.S.  In *Partida* the debtor had been convicted of embezzlement and theft.  A criminal judgment, which included a restitution component, was entered against her.  After completing her imprisonment, but not having yet paid the restitution, she filed bankruptcy.  During the bankruptcy the U.S. garnished funds from her pension and retirement benefits to apply to the restitution debt.  The debtor filed a motion against the U.S. for violation of the automatic stay, which the bankruptcy court denied on the basis that the actions of the U.S. fell within the *11 U.S.C. §362(b)(1)* exception to the automatic stay.[8]

---

[8]        *See* n. 6, *supra*.

On appeal, the 9th Circuit BAP found that, despite the bankruptcy court's holding, a "significant threshold issue" was whether the *MVRA* superseded the automatic stay. The *Partida* court found that the "plain language" of the *MVRA* indicated that it would override the *Bankruptcy Code* automatic stay.  The *Partida* court relied heavily on *United States v. Novak*, 476 F.3d 1041 (9th Cir. 2007), where the court held that *MVRA* overrode the anti-alienation provision under the *ERISA* law.

In so holding, the *Novak* court noted that the *MVRA* even expressly overrides the protections afforded to Social Security benefits, which demonstrates the "sweeping breadth" of the statute.  Following this lead, the *Partida* court stated that "[b]y allowing restitution obligations to be enforced against Social Security benefits, Congress prioritizes the enforcement of restitution orders by making available moneys traditionally protected from creditors in bankruptcy." 531 B.R. at 813.  The court rejected arguments to the effect that the passage of the "*BAPCPA*" amendments to the *Bankruptcy Code* in 2005, including some amendments to *Section 362*, should somehow deem the automatic stay provision to have been adopted after the MVRA.  In addition to the decisions in *Robinson* and *Partida, see also, e.g., U.S. v. DeCay*, 620 F.3d 534 (5th Cir. 2010) ("Notwithstanding any other Federal law" language of *Section 3613(a)* of *MRVA* was sufficient to override anti-alienation provisions of Internal Revenue Code);  *U.S. v. Wahlen*, 459 F.Supp. 2d 800 (E.D. Wisc. 2006) (same, as to *ERISA* anti-alienation provisions); *U.S. v. Beulke*, 892 F. Supp. 2d 1176 (D.S.D. 2012) (same).

Both *Robinson* and *Partida* dealt with the question of the *MVRA* and the automatic stay.  The Court has not been directed to nor found in a similar context any case addressing

16

preference actions.  Nevertheless, the same rationale the courts used in those cases to find that the *MVRA* controls over the automatic stay would also appear to apply with respect to preference claims arising in analogous circumstances.  That is to say, if a criminal restitution judgment under the MRVA is entered against a debtor pre-petition, any pre-petition payments made by the debtor from his property pursuant to the judgment order would seem to be immune from a subsequent attack in bankruptcy as a preference based on the broad "notwithstanding" language of *Section 3613(a)*.

That is not the end of the matter, however, because there is a significant factual distinction in the present case.  More specifically, unlike in *Robinson* and *Partida*, the criminal restitution judgment in the present case was not entered until after the Debtor had made the payment and until after his bankruptcy case had been filed.  Thus, the relevant question is whether the $100,000 payment can be said to have actually been made pursuant to a criminal restitution order under the *MVRA*.  The issue is one of timing.

As will be recalled from the narrative of the facts set forth above, although the $100,000 payment to CC was made on November 18, 2015, the final version of the plea agreement was not prepared until December 7, 2015.  Furthermore, Grooms was not criminally charged until December 15, 2015, and the plea agreement was not even reported to the District Court or signed by Grooms until February 29, 2016.  Finally, the plea agreement was not fully accepted by that court and actually reduced to a criminal judgment until the sentencing in July 2016.  There was thus no judgment in existence ordering the restitution payment to be made at the time of the payment by Grooms.  That is significant because *11 U.S.C. §3613(a)* provides that the U.S. "may enforce a judgment imposing a fine," and because the judgment lien in favor of the United States pursuant to

17

*11 U.S.C. §3613(c)* had not yet arisen.  Given the fact that no such judgment was in existence when the $100,000 payment was made, can it be said that the payment was made pursuant to the *MVRA* such that it should fall within the "protection" of that statute for purposes of a preference avoidance action?

The Court's initial reaction is that the payment should not receive the protection of the *MVRA*.  This is based on the same sort of "plain reading" of the statute as was done by the courts in *Robinson* and *Partida*.  More specifically, the "[n]otwithstanding any other Federal law" provision of *Section 3613(a)* is premised on the existence of "judgment imposing a fine."  Here, however, there was no such judgment in existence until some eight months after the payment was made, and in that interim, the bankruptcy case was filed.

The Court finds this significant because ultimately what the U.S. is charged to enforce pursuant to *MVRA* is not some abstract principle of restitution, but rather specific judgments imposing fines (restitution) that have been entered against specific criminal defendants.  The judgment in this case, and the lien that accompanied it,  were not in existence when the $100,000 payment was made, nor even at the time the bankruptcy case was filed.

The U.S. argues that even though the payment was made well prior to the entry of judgment such timing is "irrelevant" because it was "part and parcel of the overall criminal proceeding that culminated in the restitution order" and was made by Grooms with the understanding that it would be part of the restitution order because it was made pursuant to the terms of the negotiated plea agreement.  *U.S. Reply Brief*, Doc. No.  64, at 6.  The U.S. also asserts that restitution payments made prior to an adjudication of guilt are common in criminal cases, and that

18

once the District Court accepted the plea agreement and entered the judgment order it ratified the

payment made by Grooms. *Id*. at 5-6.

      This is an interesting argument that could potentially have merit, but the Court is

unable to accept it due to a lack of evidentiary support or legal authority for it.  As the party

asserting that the sequence of events that took place here is common, with Grooms making a

restitution payment before he was even charged with a crime, the U.S. had the burden of proof on

the issue.  *See, e.g., United States v. R. Enterprises*,  498 U.S. 292, 305 (1991) (general rule is that

burden of proof lies on the party asserting the affirmative of a proposition);   *In re Hill*, 437 B.R.

503, 536 (Bankr. W.D. Pa. 2010). The U.S., however, provided no evidence to support its allegations

regarding the typicality of what occurred concerning Grooms.

      Likewise, as the Party asserting that the District Court's acceptance of the plea

agreement and entry of judgment against Grooms in July 2016 acted as a "ratification" of the

payment that had been made to CC some eight months earlier, the U.S. again bore the burden of

proof on that issue.  *Hill, supra*;  *Gomez v. Huntington Trust Co., N.A.*, 129 F. Supp. 2d 1116, 1129-

30 (N.D. Ohio 2000) (ratification is an equitable defense upon which the proponent has burden of

proof).  The U.S. has not cited to any convincing legal authority for the proposition that the

judgment could act as a ratification, particularly in circumstances such as here where the bankruptcy

was filed in the interim between the payment and the entry of judgment.   Additionally, to reiterate

a point made previously, the MVRA itself specifically provides that "a judgment imposing a fine."

may be enforced, *18 U.S.C. §3613*(a), that the liability thereby created terminates "the later of 20

years from the entry of judgment" or 20 years after the defendant is released from imprisonment,

*§3613(b)*, and that the "lien arises on the entry of judgment." *Section 3613(c)*. Thus, all material

phrases of the statute are keyed to the entry of the judgment. There is nothing in the statutory

language to indicate that the court imposing a criminal restitution order under the MVRA has the

power to give such a judgment retroactive effect, and in any event the judgment entered against

Grooms in the present case does not purport to do so.

The only legal authority to which the U.S. points in regard to its "ratification"

argument is *Fed.R.Crim.P. 11(c)(1)(C)*,[9] which it cites for the proposition that the District Court

became bound to the plea agreement once it accepted the plea agreement. The Court agrees with

that proposition, but it actually says little of relevance here because the District Court was not

required to accept the plea agreement, and until it did so, the parties were not bound by it. *See, e.g.*,

*U.S. v. Washman,* 66 F.3d 210 (9th Cir. 1995). Furthermore, neither *Rule 11(c)(1)(C)*, nor the cases

interpreting it, reference anything regarding a court's acceptance of a plea bargain as having any sort

of ratification or retroactive effect.

---

[9]    *Fed.R.Crim.P. 11(c)(1)(C)* provides:

(c)    <u>Plea Agreement Procedure.</u>

(1) <u>In General</u>. An attorney for the government and the defendant's attorney, or the
defendant when proceeding pro se, may discuss and reach a plea agreement. The court must not
participate in these discussions. If the defendant pleads guilty or nolo contendere to either a charged
offense or a lesser or related offense, the plea agreement may specify that an attorney for the
government will:
        ...
        (C) agree that a specific sentence or sentencing range is the
        appropriate disposition of the case, or that a particular provision of
        the Sentencing Guidelines, or policy statement, or sentencing factor
        does or does not apply (such a recommendation or request binds the
        court once the court accepts the plea agreement).

The Court therefore finds no basis to accept the argument of the U.S. that the timing of the payment as compared with the entry of judgment can be ignored as irrelevant, or that it can be ignored based on a ratification.

The U.S. next points to *18 U.S.C. §3664(m)(1)(A)(ii)* as a basis for a grant of summary judgment in its favor. *Section 3664* is entitled "Procedure for issuance and enforcement of order of restitution," and the particular portion relied upon by the U.S. provides as follows:

> (m)(1)(A)(i)   An order of restitution may be enforced by the United States in the manner provided for in subchapter C of chapter 227 and subchapter B of chapter 229 of this title; or
>
> (ii)   by all other available and reasonable means.

*18 U.S.C. §3664(m)(1)(A).* Subsection (i) of this provision refers back to subchapter B of chapter 229 of Title 18, and in that regard principally to *18 U.S.C. §3613* which, as discussed above, provides that an order of judgment in a criminal case may be enforced in accordance with the practices and procedures for the enforcement of a civil judgment under Federal or State law. However, as also discussed above, this does not help the U.S. because by the time the judgment was entered against Grooms the transfer at issue had already occurred.

In making the argument presently under consideration, the U.S. now focuses on subsection (ii), which provides that the U.S. may also use "all other available and reasonable means" to enforce the judgment. According to the U.S.:

> That is exactly what the United States is doing here: fighting for the
> Victim's rights and enforcing the restitution order by allowing the
> Victim to retain the payment.  Allowing the Victim here to retain the
> restitution payment is available as an enforcement tool and is
> certainly reasonable.

*U.S. Reply Brief* at 2.

This is a question-begging argument that does nothing to advance the Court's inquiry. The issue before the Court is precisely whether allowing CC to retain the payment in the face of the Trustee's preference claim based on the *MRVA* is an "available" remedy.  The Court finds that, contra the U.S. argument, *Section §3664(m)(1)(A)(ii)* does not make an override of the Trustee's preference claim an available remedy in the present case.

First, the key thrust of the U.S. position all along has been that the "Notwithstanding any other Federal law" language of *Section 3613(a)* sweeps aside any other Federal law, such as a preference action under the *Bankruptcy Code,* that may interfere with enforcement of a restitution order.  However, while that language is part of *Section 3664(m)(1)(A)(i)* (in that such provision effectively refers back to *Section 3613(a)* where the language actually occurs), it is not part of or incorporated into *Section 3664(m)(1)(A)(ii).*  In making an argument that *Section 3664(m)(1)(A)(ii)* enables the relief it seeks, the U.S. thus loses the benefit of the "notwithstanding" provision, and it has pointed to no other basis upon which the preference provision under the *Bankruptcy Code* might be overridden.

Secondly, although the U.S. did not cite to any cases decided under *Section 3664(m)(1)(A)(ii)* in support of its argument,  the Court has taken the time to review the relevant case law and does not find anything that would support the conclusion that such provision gives the

22

U.S the ability to block an otherwise meritorious preference claim. There are cases, for example that rely on *Section 3664(M)(1)(A)(ii)* as a basis for ordering an accounting to assist in enforcement of a restitution order, *see U.S. v. Gallon*, 504 Fed. Appx. 373 (6th Cir. 2012), or issuing a writ under the *All Writs Act*, *see U.S. v. Beulke*, 892 F. Supp.2d 1176 (D. S.D. 2012), or to permit the U.S. to retain money that the defendant pulled out of his pocket to hand to his wife at his sentencing hearing, *see U.S. v. Anh Ngoc Dang*, 559 Fed. Appx. 660 (10th Cir. 2014). The Court found no case holding that *Section 3664(M)(1)(A)(ii)* can be used as a basis to thwart an otherwise valid bankruptcy preference claim so as to allow the recipient of a restitution payment that was made before any restitution judgment under the *MVRA* was entered to retain that payment – and it now declines to extend the statute to such an extent in the face of the clear provisions of the *Bankruptcy Code*.

The U.S. also seems to presume that the $100,000 at issue is in some sense already property of the bankruptcy estate. Relying on *Robinson*, it argues that for purposes of *Section 3613(a)* the creation of a bankruptcy estate is a "legal fiction" that does not affect the ability of the U.S. to enforce the order of restitution. *U.S. Reply Brief* at 4. The point of this assertion appears to be that, if the $100,000 were presently in the hands of Grooms outside of the bankruptcy estate, the U.S. would be able to enforce the restitution order as against those funds, so too it should be able to enforce the order as against the preference recovery which it sees as property of the legal fiction that is the bankruptcy estate. Along the same lines, the U.S. argues that it would be "futile" to let the Trustee make a preference recovery here because the U.S. would then be able to enforce the restitution order as against such recovery. *Id.* at 7.

These arguments of the U.S. are premature. Until such time as the Trustee were to make a recovery of the $100,000, it cannot be considered part of the bankruptcy estate. *In re Wagner*, 353 B.R. 106, 112-13 (Bankr. W.D. Pa. 2006). Furthermore, the Trustee's abstract, unrealized right to avoid and recover is not itself "property of the estate." *In re Cybergenics Corp.*, 226 F.3d 237, 243-244 (3d Cir.2000). Therefore, even assuming arguendo that the enforcement rights of the U.S. extend to property of the estate, nothing related to the $100,000 payment to CC is property of the estate right now, so there is presently no basis for the U.S. argument.

That state of affairs will not necessarily last. In *In re Allen*, 768 F.3d 274 (3d Cir. 2014) the Court found that for purposes of determining when an avoidance action had been "recovered" by the trustee, entry of judgment in favor of the trustee is sufficient and actual tangible possession of the funds at issue is not required. In other words, if the Court enters summary judgment in favor of the Trustee on the preference claim, the $100,000 in dispute will immediately become property of the estate and the issue of whether the U.S. has any enforcement rights as against such property will become actual and not just potential. The question for the Court is whether that issue should be addressed now as part of the decision on the *Motions*, or whether the Court should act in a more step-by-step fashion and simply rule in favor of the Trustee on his preference claim, leaving the enforcement as against property of the estate a matter for later determination if and when it arises. Because the Parties have addressed the issue and there is no benefit to further delay, the Court will provisionally assume a grant of summary judgment to the Trustee on his preference claim (subject to the new value defense raised by CC and discussed, *infra*) and proceed to address that issue now.

24

### (2) *The Inability of the U.S. to Enforce the Restitution Order as Against the Property of the Estate from the Preference Action Proceeds*

The Court having provisionally decided that the Trustee is entitled to summary judgment on his preference claim, thereby for the sake of discussion bringing the proceeds of that action into the estate as property of the estate pursuant to *11 U.S.C. §541(a)(3),*[10] the question turns to what happens next.  Not surprisingly, the Parties have different views.

The U.S. argues that its enforcement remedy is broad enough to include the proceeds of the preference recovery now in the hands of the estate, that it may immediately act to implement that enforcement remedy as to those proceeds without being bound by the strictures of the automatic stay, and that therefore the Trustee's victory on the preference claim was but a fleeting or symbolic one of no real effect.  The Trustee argues that the enforcement remedy of the U.S. under the *MVRA* only extends to property rights of Grooms, that proceeds from the recovery in the preference action are solely property of the estate to the exclusion of Grooms, and that therefore the proceeds may not be the subject of such enforcement remedy.  This appears to be a matter of first impression, but once again, the Court finds that the Trustee has put forward the position that is most in accord with applicable law.

As a starting point, although the Court does not understand the U.S. to be arguing, at least explicitly, that the lien it enjoys pursuant to *Section 3613(c)* extends to the proceeds of the preference recovery now brought into the bankruptcy estate,  such argument must be rejected in any

---

[10]    *See also, In re Southeast Railroad Contractors, Inc.*, 235 B.R. 619 (Bankr. E.D. Tenn. 1996) and *Frank v. State of Michigan*, 263 B.R. 538 (E.D. Mich. 2000)

event.  It was noted above that such lien did not arise until "the entry of judgment," which in this

instance was not until July 18, 2015.[11]   By that time Grooms had long since transferred the funds

to CC and filed his bankruptcy case.  In addition to clearly establishing the time of the creation of

the lien, *Section 3613(c)*, also defines its scope, stating that the lien:

> ... is in favor of the United States on all property and rights to
> property of the person fined as if the liability of the person fined were
> a liability for a tax assessed under the Internal Revenue Code of
> 1986.

*18 U.S.C. §3613(c)*.  In other words, the lien which the U.S. is given in order to facilitate its

enforcement of criminal restitution orders against a defendant under the *MVRA* is of the same extent

as if an assessment of tax liability had been made against the defendant.   The Court must therefore

look to federal tax assessment liability law for guidance on how to treat the lien here.

The right of the federal government to enforce a tax lien or levy on property rises no

higher than those of the taxpayer in the property.  *See, e.g., U.S. v. Rodgers*, 461 U.S. 677, 690-91

(1983) (government's tax lien cannot extend beyond the property interest held by the delinquent

taxpayer); *Karno-Smith Co. v. Maloney*, 112 F.2d 690, 692 (3d Cir. 1940).  For that reason a tax lien

cannot attach to property that was transferred by the taxpayer prior to the tax being assessed.  *See,

e.g., Gardner v. U.S.*, 814 F. Supp. 983, 985 (D. Kan. 1993).  In *U.S. v. Doyle*, 276 F.Supp. 2d 415

(W.D. Pa. 2003) the court summarized these points:

---

[11]      At one point, the U.S. argued that by finding in favor of the Trustee the Court would
essentially be placing "a criminal fine or restitution on the same footing" as a credit card or other
unsecured creditor in a bankruptcy case.  *See U.S. Brief in Support of Summary Judgment* at p.8.
That is not the case here.  The Court's order in this matter simply identifies the funds against which
the lien attaches.

The applicable law is as follows. "Upon assessment, a federal tax lien attaches to all property and rights to that property belonging to a taxpayer. See 26 U.S.C. §§ 6321 and 6322. Generally, a tax lien does not attach to property that a taxpayer previously transferred and which ostensibly no longer belongs to the taxpayer. Id. However, if a taxpayer fraudulently disposes of property prior to the existence of tax liens, the Government may seek relief under the applicable fraudulent conveyance laws of the state in which the property is located."

276 F. Supp. 2d at 429 (quoting *United States v. LaBine*, 73 F.Supp.2d 853, 857 (N.D.Ohio 1999)).

Applying these principles in the present case, and recognizing that the U.S. has never invoked a fraudulent conveyance theory in an effort to undo the transfer, leads to the clear conclusion that the lien of the U.S. did not in any manner extend to the $100,000 which Grooms had already transferred to CC before the lien ever arose.

Nor can the lien somehow be extended to encompass the $100,000 upon its subsequent acquisition by the bankruptcy estate pursuant to the Trustee's preference action. As the Trustee correctly points out, the U.S. lien under the *MVRA* arose post-petition, is defined by the *MVRA* to have the same extent as a federal tax lien, and is therefore subject to *11 U.S.C. §362(b)(9)(D)*, which sets forth an exception to the automatic stay that allows for a post-petition tax assessment to be made during a bankruptcy, but which also provides:

...(but any tax lien that would otherwise attach to property of the estate by reason of such an assessment shall not take effect unless such tax is a debt of the debtor that will not be discharged in the case and such property or its proceeds are transferred out of the estate to, or otherwise revested in, the debtor).

*Id*.  Under no scenario will the $100,000 proceeds be transferred out of the estate or otherwise

revested to Grooms.  Thus, although pursuant to *Section 362(b)(9)(D)* the U.S lien could arise with

the issuance of the criminal order in July 2016 during the Grooms' bankruptcy without violating the

automatic stay, it does not attach to the preference action proceeds which are property of the

bankruptcy estate being administered by the Trustee.[12]   The Court therefore concludes that the lien

created pursuant to *18 U.S.C. §3613(c)* provides no basis whereby the U.S. can assert a right to

possession or control of the $100,000 in preference action proceeds recovered by the Trustee.

It may also be pointed out that *11 U.S.C. §551* also stands as an obstacle in the way

of any attempt by the U.S. to assert that the MVRA lien would attach to the $100,000 payment

avoided in this preference action.  That provision states in pertinent part:

> Any transfer avoided under Section ... 547 ... of this Title ... is
> preserved for the benefit of the estate but only with respect to
> property of the estate.

*11 U.S.C. §551*.  Courts have held that, pursuant to this provision, if property subject to a lien is

transferred prepetition to a third party and later, after a bankruptcy filing, the trustee avoids the

transfer as a preference, the lien does not reattach to the property, but comes into the estate free of

such lien.  *See, e.g., In re Integrated Testing Products Corp*., 69 B.R. 901, 904-05 (Bankr. D.N.J.

---

[12]     The U.S. has not made the argument that its lien should be found to attach to the
preference proceeds in the hands of the Trustee despite the parenthetical language in *11 U.S.C.
§362(b)(9)(D)* based on  the "Notwithstanding any other Federal law" language of *18 U.S.C.
§3613(a)*.  Had it done so, the Court would likely reject such argument as the product of circular
reasoning leading to an absurd result.  That is to say, it would be absurd to find that the *MVRA* could
explicitly provide in one place that a criminal restitution lien is to be treated the same as a tax lien,
but then use the notwithstanding clause found elsewhere in the statute to avoid just such treatment.

1987), *In re Abner*, 288 B.R. 538, 540 Bankr. C.D.Ill. 2001). If *Section 551* has this effect even with respect to a lien that was already in existence and had attached when the preferential transfer was made, then *a fortiori* it would block an after-the-fact lien from attaching to the Trustee's recovery.

Since the *Section 3613(c)* lien is not applicable here, is there some other basis upon which the U.S. can rely in order to obtain the benefit of the proceeds so that they go solely toward payment of the restitution order?  The U.S. asserts that the lien is but one arrow in a quiver provided by the *MVRA* containing a "host of enforcement remedies," but beyond that it provides no specifics, relying only on the "all other available and reasonable means" language found in *18 U.S.C. §3664(m)(1)(A)(ii)*.  For reasons discussed above the Court found that argument unpersuasive as a basis to deny the Trustee relief on his preference action claim, and finds it even less persuasive as a basis for the U.S. to wrest control of the proceeds from the Trustee now that he has actually recovered them for the estate.

The only case law relied upon by the U.S. in this regard is the *Robinson*  case discussed earlier.  That  case is factually distinguishable as to a very key point, however,  in that there the  U.S. had obtained a restitution order against the debtor prior to the bankruptcy filing.  The U.S. thus already  had a lien against all of the debtor's  property *prior* to the filing of the bankruptcy case.  The holding of the *Robinson* court was to the effect that the U.S. could enforce its lien to satisfy the restitution order as against that same property after the bankruptcy filing, notwithstanding that it had become property of the estate upon the bankruptcy filing, and notwithstanding the automatic stay. 764 F.3d at 562.

29

In sharp contrast, in the present case the U.S. did not have a lien on any of Grooms' property prior to the bankruptcy filing and does not even now have a lien interest on the preference proceeds as recovered by the Trustee to become  property of the estate.  The rationale behind the decision in *Robinson* is totally lacking here.   Moreover, to reiterate a point made earlier, the *Robinson* court based its decision on the "notwithstanding" language found in *Section 3613(a)*, which is incorporated into *Section 3664(m)(1)(A)(i)*, but that language is not applicable when the U.S. is relying upon the "all other available and reasonable means" provision under *Section §3664(m)(1)(A)(ii)* as it is here.

The Court therefore concludes that once the proceeds are brought into the estate pursuant to the grant of summary judgment for the Trustee, no enforcement rights that the U.S. may have under *MRVA* are sufficient to overcome the Trustee's obligation to administer such proceeds pursuant to the *Bankruptcy Code*.  This outcome by no means undermines the effect or integrity of a properly timed restitution payment by a criminal defendant filing Bankruptcy.   It merely recognizes the effect of an intervening bankruptcy when restitution is a component of a sentencing order.

### (3) CC's New Value Defense Lacks Merit

CC has raised an affirmative defense of new value in this case which must also be addressed before the Court can reach a final decision.  CC argues that the $100,000 payment cannot be recovered by the Trustee on the basis of *Section 547(c)(1)*, which provides:

(c)    The trustee may not avoid under this section a transfer–

(1)    to the extent such transfer was-
(A)    intended by the debtor and the creditor to or
for whose benefit such transfer was made to
be a contemporaneous exchange for new
value given to the debtor; and
(B)    in fact a substantially contemporaneous
exchange.

CC argues that by paying the $100,000 toward restitution prior to his sentencing pursuant to the plea

agreement, Grooms was thereby able to secure a shorter prison sentence than he otherwise would

have received if he had not made such payment.[13]    In other words, CC contends that Grooms

received new value for making this payment. As far as the contemporaneous exchange requirement,

CC argues that the implementation of a plea agreement is a process, not an event, and that the timing

of the payment and the imposition of the sentence were sufficiently proximate to meet that

requirement.    CC relies on a couple of cases in support of its position.    *See, In re Tower*

*Environmental, Inc.*, 260 B.R. 213 (M.D. Fla. 1998) and *In re Citron*, 428 B.R. 562 (E.D.N.Y.

2010).

In *Tower* the debtor was an environmental consulting firm that did environmental

remediation work on contaminated properties for which it was paid out of a Florida state fund.  An

---

[13]    The evidence as to how much of a reduction in his sentence Grooms actually received
due to the $100,000 restitution payment is thin. Based on statements made by Judge Cercone at the
sentencing hearing, the Guideline range for the offense to which Grooms pleaded guilty was 27 to
33 months, and the sentence actually imposed was for 24 months, which Judge Cercone
characterized as a "slight variance." *See Transcript of Sentencing Hearing,* July 11, 2016, at 14-15,
attached as Exhibit 1 to Trustee's response to U.S. Motion, Doc. No. 58.  The variance was thus
somewhere between 3 months and 9 months, and it is impossible for this Court to say how much
effect the $100,000 payment had on that variance.  For purposes of deciding the *Motions*, the Court
presumes there was a reduction in sentence attributable to the payment, but it makes no finding
beyond that.

investigation by Florida turned up multiple instances of wrongdoing by the debtor in applications

for payment for this work, resulting in an indictment against the debtor for theft and racketeering.

The debtor and Florida entered into a plea agreement, part of which called for the debtor to make

restitution payments to the state in installments over 24 months. In return, Florida agreed to refrain

from further pursuit of the criminal charges and that it would not oppose a plea of nolo contendere.

The debtor actually completed the required payments in only 8 months. About 8 months later an

involuntary bankruptcy petition was filed against the debtor.

      The creditors committee in the bankruptcy case attacked payments made pursuant

to the plea agreement as fraudulent transfers. The *Tower* court found that the debtor had received

value in exchange for the restitution payments in that in exchange for such payments the criminal

charges had been dropped, saving the debtor from the expense and exposure to punishment it would

otherwise have faced. It also found that the value received was "reasonably equivalent" to the

payments, and thus concluded that the payments were not fraudulent transfers. While *Tower* does

support CC's argument in a limited respect, there are obvious and significant differences between

it and the present case which render it less than compelling as a strong precedent. These differences

include that: (1) the claim in *Tower* was brought and analyzed as a fraudulent transfer matter, not

a preference;[14] (2) the debtor in *Tower* actually avoided having to plead guilty by entering into the

---

[14]    The "tests" for a "reasonably equivalent value" defense to a fraudulent transfer action and a "new value" defense to a preference action are not the same. As stated by the Court in *In re Jotan, Inc.*, 264 B.R. 735 (Bankr. M.D. Fla. 2001):

> A creditor seeking to except a preferential transfer from avoidance under *§547(c)(I)* must supply proof of the specific dollar value of any "new value" provided in exchange for the transfer. *See Jet Florida, Inc. v. American Airlines, Inc.* (In re Jet Florida Systems, Inc.), *861 F.2d 1555, 1559 (11th Cir. 1988)*. A creditor asserting a *§547(c)(1)*

plea agreement; and, (3) the plea agreement was negotiated between the debtor and the party that received the restitution payment.

In *Citron*, the debtors were a married couple who were both indicted by the state of New York in connection with an insurance fraud scheme. They each entered into plea agreements that included their agreement to pay fines to the state. Liberty Mutual Insurance, which was a victim of the debtors' fraud, attacked payments made pursuant to the plea agreements as having been preferences and fraudulent transfers. New York conceded that the transfers met the elements for a preference, but argued that they should be excepted from avoidability under *Section 547(c)(1)* because they were a contemporaneous exchange for new value.

---

defense must show that a preferential transfer conferred actual economic benefit upon a transferee/debtor, rather than merely showing that a transferee/debtor and creditor intended some hypothetical or ephemeral value to be conferred. See *Id. at 1558-1559*. If *§547(a)(2)* merely required proof that a creditor provided any consideration for a transaction, then *§547(b)* would be reduced to an anti-fraud provision.

264 B.R. 735, 751. In a footnote, the *Jotan* court went on to say:

The Court notes that the requirement of specific proof of valuation separates the *§547(a)(2)* "new value" test from the *§548* "reasonably equivalent value" concept – the former is an economic analysis, while the latter is merely an anti-fraud provision. It is this distinction that allows a court to conclude that a preferential transfer is not fraudulent under *§548* because "reasonably equivalent value" was given and at the same time to conclude that the same preferential transfer may be avoided because insufficient "new value" was provided to satisfy *§547(c)(1)* or *§547(c)(4)*. Not all consideration qualifies as "new value."

*Id. at fn 6.* In other words, a party asserting a new value defense to a preference action faces a more demanding task than a party asserting a reasonable value defense to a fraudulent transfer action.

33

The *Citron* court analyzed the claims against the two debtors individually because the circumstances as to each were distinct.  It held that as to the wife, *Section 547(c)(1)* did not apply because she made her payment 4 months after she had been sentenced, so there was not a contemporaneous exchange.  The husband made his  payment at the same time as his sentencing, so the court found that the contemporaneous exchange element was met.  However, the court stated that

> "no summary judgment evidence is before this Court as to the quantitative value of the reduced prison term and/or reduced fines from which this Court could determine the extent to which N.Y. provided new value."

*428 B.R. at 574*.  The court thus found that a trial would be required as to the preference claim involving the husband's payment.

The *Tower* and *Citron* cases suggest that, given the right circumstances, it might be possible to successfully assert a new value defense to a preference claim that is seeking recovery of restitution payments made pursuant to a plea agreement that benefits the debtor by a reduction in sentence.  The Court is not convinced that this result comports with the underlying reason for recognizing a new value defense to a preference claim.  As was succinctly explained by the court in *In re Instrumentation and Controls, Inc*., 506 B.R. 677 (Bankr. E.D. Pa. 2014):

> The *§547(c)(1)* defense is rooted in one of the core purposes of bankruptcy preference law, which is to permit the trustee to recover certain transfers made shortly before the filing of the bankruptcy case in order to promote the orderly, equality of distribution among creditors ... Thus, if the bankruptcy estate was not depleted or diminished by a transfer because the estate received back new value

34

equivalent to the value of the outgoing transfer, there is no detriment to the other creditors, no bankruptcy purpose is achieved by setting aside the transfer, and §547(c)(1) provides a defense to the preference claim.

506 B.R. at 679 (citations omitted).  While a reduction in a debtor's criminal sentence undoubtedly benefits the debtor personally, it does nothing to bring anything of financial value back into the estate to offset the detriment to the other creditors caused by the restitution payment.  Thus, recognition of a reduction in sentence as new value received in exchange for payment of restitution is highly questionable in light of the purpose of the *Section 547(c)(1)* new value defense.

This is further highlighted by the definition of "new value" for preference action purposes which is provided in *Section 547*:

(2) "new value" means money or money's worth in goods, services, or new credit, or release by a transferee of property previously transferred to such transferee in a transaction that is neither void nor voidable by the debtor or the trustee under any applicable law, including proceeds of such property, but does not include an obligation substituted for an existing obligation;

*11 U.S.C. §547(a)(2)*.  It is not at all clear that a reduction in sentence can fit within this definition, particularly where the use of the word "means" rather than "includes" indicates that the definition is exclusive and not open-ended.  *See, In re Aero-Fastener, Inc.*, 177 B.R. 120, 137 (Bankr. D. Mass. 1994) (citing cases), *11 U.S.C. §102(3)* ("includes" and "including" are not limiting terms in Bankruptcy Code).   Whatever a reduction in sentence may be, it is not money, goods, new credit, or a property release.  Possibly it could be argued that a reduction in sentence constitutes a "service," the sole remaining category recognized in the statutory definition, but that seems a stretch.

35

The statutory definition of "new value" in *Section 547(a)(2)* has caused courts to reject attempts to have intangible benefits received in exchange for payments treated as new value. *See, e.g. Aero-Fastener, supra* (new value does not consist of "esoteric or intangible benefits" but instead "must actually and in real terms enhance the worth of the debtor's estate so as to offset the reduction in the estate that the transfer caused"); *In re Agriprocessors, Inc.*, 547 B.R. 292 (N.D. Iowa 2016). It would appear to the Court that a reduction in a sentence is just the sort of esoteric or intangible benefit that will not be recognized as new value, and that furthermore any benefit received went only to the Debtor personally and did not redound in any way to the benefit of the estate and the creditors, generally. Thus, the Court is not persuaded by *Tower* and *Citron*.[15]

However, even if the Court were to agree with those cases and find that in the right circumstances a reduction in sentence in exchange for a restitution payment under a plea agreement might constitute new value for purposes of *Section 547(c)(1)*, there are other reasons why the present case does not present circumstances that are amenable to such an affirmative defense. To begin with the most obvious reason, *Section 547(c)(1)(B)* requires that the transfer in fact be a "substantially contemporaneous exchange." Here, while Grooms made the payment to CC on November 18, 2015, the District Court did not finally accept the plea agreement and enter the judgment order until 8 months later on July 18, 2016. Were the Court to give CC the benefit of every doubt and find that the "preliminary" acceptance of the plea agreement by the District Court

---

[15]    Also, the facts of *Citron* are qualitatively different from those of this case. Here, the amount of restitution ultimately payable by Grooms, that is $485,800, has not been compromised in any amount. Unlike *Citron* where there was a significant reduction in the potential "fine" of over $16 Million reduced down to $75,000, here there was no reduction in the restitution amount.

on February 29, 2016 was sufficient to constitute the exchange of new value that reciprocated Grooms' payment to CC, there would still be 104 days between the two events constituting the exchange.

Courts follow two approaches in determining whether an exchange is in fact substantially contemporaneous, with some adopting the time limit for perfection of a security interest under *Section 547(e)(2)* (currently 30 days, but previously 10 days) as a bright-line rule, while others take a "totality of the circumstances" approach.  It appears that within the Third Circuit the totality of circumstance approach predominates, and it looks at such factors as the length of delay, the reason for the delay, the nature of the transaction, the intention of the parties, and the possible risk of fraud.  *See, e.g., In re Hayes Lemmerz International, Inc.*, 329 B.R. 136, 140 (Bankr. D. Del. 2005).

Even under the more flexible totality of circumstances approach it is difficult to see how a gap of the magnitude of a minimum of 104 days, and more realistically 8 months,  could ever be found to satisfy the substantially contemporaneous requirement of the statute.  In addition to *Citron* itself where a 4-month delay between sentencing and restitution payment was found disqualifying*, see* for example: *In re Samar Fashions, Inc.*, 109 B.R. 136 (Bankr. E.D. Pa. 1990) (check post-dated 45 days given as payment for goods cannot be considered as given in a substantially contemporaneous exchange for the goods); *In re A.J. Lane & Co., Inc*., 164 B.R. 409 (Bankr. D. Mass. 1994) (delay of 32 days or more in delivery of checks to contractor prevented payments from being in fact substantially contemporaneous); *In re Coco*, 67 B.R. 365 (Bankr. S.D.N.Y. 1986) (rent payments made 34 and 64 days late were not substantially contemporaneous).

37

CC has not cited to any case wherein a delay of a length anywhere similar to what occurred here was found to be substantially contemporaneous, nor has it provided any evidence that would lead the Court to believe that, notwithstanding the long delay, the totality of the circumstances should cause this to be treated as a substantially contemporaneous exchange. The Court is also unpersuaded by CC's contention that the entire sequence of events from the $100,000 payment to the entry of the restitution judgment order should be treated as a unitary process, for the same reasons as stated above in connection with the similar argument put forward by the U.S.

A second reason why the *Section 547(c)(1)* new value affirmative defense does not apply here is that the statute requires that a transfer must be "intended by the debtor and the creditor to or for whose benefit such transfer was made" to be a contemporaneous exchange for new value given to the debtor. *Section 547(c)(1)(A)*. No evidence of such intent has been presented, and in fact CC admits it was not involved at all in the negotiations between Grooms and the U.S. that led to the plea agreement, but was merely a passive recipient of the $100,000 payment that was made to it pursuant to that agreement.[16] *See,* CC Answer to Interrogatory Nos. 9 and 10, Attached as

---

[16] This is not to say that a transaction involving 3 parties can never qualify for the new value defense. There is case law holding that payments made to a creditor may be exempt from avoidance as a preference if the debtor in exchange receives contemporaneous new value from a third-party other than the creditor. *See, Collier on Bankruptcy* at ¶547.04[2]. For example, in *In re 360networks (USA) Inc.*, 338 B.R. 194 (S.D.N.Y. 2005) the court held that the intent element of *Section 547(c)(1)* could be satisfied if either the debtor and the transferee, or the debtor and the party for whose benefit the transfer was made, intended a substantially contemporaneous exchange for new value. Perhaps it could be argued that CC should be able to "get the benefit" of the intent of the U.S. with respect to the plea agreement in order to support CC's *Section 547(c)(1)* defense based on this sort of analysis, though CC has not made such argument. And in any event even if such argument were accepted it would still not help CC because: (1) there is no evidence of record to show that the U.S. intended a substantially contemporaneous exchange for new value; and, (2) CC would then seem to be in the position both of transferee and party for whose benefit the transfer was made, so the *360networks* rationale would not then apply.

Exhibit K to the *Trustee Motion*. If it was not involved in negotiating the plea agreement, and was

not even asked for its input into such negotiations, there does not seem to be any meaningful way

in which CC can ever be said to have intended a contemporaneous exchange for new value.

To sum up, as a defendant seeking to invoke the "new value" defense, CC bears the

burden of proof on the required elements of such defense, including substantially contemporaneous

exchange in fact and intent of a contemporaneous exchange. *See, Section 547(g)*. In the context

of responding to a motion for summary judgment, therefore, once the Trustee satisfied his initial

burden of showing that the new value defense is unsupported by the record, which the Court finds

he has done, CC, as the party with the burden of proof, was required to present evidence to show

that these elements are met. CC failed to do so and therefore summary judgment should be entered

against it.[17]

## CONCLUSION

This has been a difficult decision for the Court to make for a number of reasons.

Perhaps most obviously, the Court recognizes the financial and dispiriting impact that the result

reached will have on CC. Having been an unwitting victim of Grooms' fraud in the first instance,

CC will feel itself victimized a second time because the partial restitution it had received is

---

[17]    In addition to the lack of a substantially contemporaneous exchange, and the failure to show intent, the CC argument also raises significant questions due to the fact that the supposed new value in the form of a reduced sentence was received after the bankruptcy petition was filed. *See, e.g., In re Kumar Bavishi & Assoc.*, 906 F.2d 942, 950-51 at n. 9 (3d Cir. 1990) (discussing whether a post-petition event can qualify as new value under *Section 547(c)(1)*, Cowen J. dissenting). In light of the other grounds cited by the Court to reject the new value defense this line of analysis need not be explored further.

seemingly being snatched away through no fault of its own.  While this feeling would certainly be understandable, the Court is hopeful that CC will be able to derive considerable consolation from the fact that as an unsecured creditor it still stands to make a recovery through the Trustee's administration of the bankruptcy estate, and that following the bankruptcy, unlike any other creditor, it stands to make a further recovery because Grooms' obligation to CC will not be discharged.[18]

Another reason for the difficulty of the decision is that the very questionable track record of Grooms as outlined herein  lends some credence to the thought that his bankruptcy filing may have been one more example of gaming the system, something of which the Court is loathe to be a part. Nevertheless, this distaste,  of itself,  is not a sufficient reason to avoid the application of the law as the Court finds it.

The events occurring at the Grooms' sentencing hearing, especially the comment by the District Court to the effect that it could not imagine the $100,000 restitution payment  being disturbed in bankruptcy, also weighed heavily on the Court.  Because of this Court's utmost respect for the District Court, it certainly does not relish coming to a conclusion so contrary to that expressed expectation.  However, this Court is also mindful that the issue came up "cold" at the sentencing hearing based on the statements by Kongelka.  The District Court was thus forced to deal with the matter "on the fly," without having had a chance  to consider it in advance.  The

---

[18]    Although it played no role in the Court's decision in this matter, it is at least worth noting that in large part CC was only able to obtain the pre-petition  partial restitution payment from Grooms in the first place because of the apparent additional instance of fraud Grooms perpetrated on Erie Bank to secure the loan that helped fund the payment.

District Court was also forced to rely on a one-sided and, as it turns out,  not wholly accurate presentation of the issue, with no input provided from the perspective of the Trustee.

As the foregoing Opinion makes clear, however, the conflict between the U.S. and the Trustee as to the ultimate disposition of the $100,000 payment presents some complex issues of statutory interpretation and conflicting legal policies.  As such, this Court will indulge in the presumption that if the District Court had enjoyed the same luxury as this Court after full briefing and argument as to both sides of the issue, and the benefit of an appropriate time to fully digest and consider the competing positions, its comments at the sentencing hearing may have been different. Even so, this provides only small comfort to the Court in reaching its decision.

Despite all these misgivings, it is the duty of this Court to reach a result that lies where it believes the law leads.  That result, even if viewed strictly from a "balancing of concerns" standpoint, also has much to recommend it.  While CC loses the benefit of the $100,00 payment, it still eventually  stands to recover a portion back in the bankruptcy as a distribution on its claim against Grooms, and of course the remaining balance owed after that will not be discharged by the bankruptcy.  Other creditors of the estate, including notably the "other" victim of Grooms' fraud, Erie Bank, are similarly protected because they will receive their pro rata distribution under the Bankruptcy Code.  The decision rendered here also has the effect of denying Grooms the full benefit of his questionable activities because his restitution obligation to CC will not be reduced by the full $100,000, as it would if the preference recovery were denied, but only by the amount CC will actually receive as its pro rata share of the bankruptcy distribution.  The balancing of all

Parties interests are best served by authorizing the Trustee to recover the $100,000 preference.[19]

        As for the U.S., the Court commends its zealous efforts on behalf of CC and hopes that if nothing else this case will serve a purpose by highlighting a correctable vulnerability in the restitutionary process so that future cases involving plea agreements, restitution and the possible effect of an intervening bankruptcy filing are resolved consistent with the parties' initial expectations. It is not the Court's role here to lay out how that can be done, but such steps as requiring the criminal defendant to explain where funds to make the restitution payment will be obtained, delaying payments until criminal charges have been filed or a criminal restitution order has been issued, or conditioning the completion of a plea agreement on the defendant refraining from any bankruptcy filing following a restitution payment, at least until the preference period has run, seem like obvious approaches to be explored.

        An appropriate Order follows.

Dated: August 22, 2017

_____
Thomas P. Agresti, Judge
United States Bankruptcy Court

Case administrator to serve:
    John Melaragno, Esq.
    John Nagurney, Esq.
    Jill Locnikar, Esq.
    Stephen Hutzelman, Esq.
    Debtor

---

[19]    Also, while CC may lose its "upfront" portion of the required restitution payment, which requirement the Debtor must fulfill as a condition of sentencing, with the recapture of the $100,000 to be shared pro-rata with other creditors of the Estate, the Debtor actually is being monetarily punished *more* than he would be otherwise. As noted previously, the restitution payment of $485,800 will follow the Debtor regardless of the bankruptcy. But at least now he has been required to make an additional $100,000 payment to benefit *all* creditors.